UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                                    :
FRANCINE LIOI,                                                      :
                                        Plaintiff,                 :
                        -v-                                         :
                                                                    :
NEW YORK CITY DEPARTMENT OF HEALTH &                               :          10 Civ. 6445 (PAE)
MENTAL HYGIENE,                                                    :
MARTIN EVANS, and                                                 :          <u>OPINION & ORDER</u>
DAVID HADDOW,                                                     :
                                                                    :
                                        Defendants.                :
                                                                    :
------------------------------------------------------------------------ X

PAUL A. ENGELMAYER, District Judge:

 Plaintiff Francine Lioi, a former employee in New York City's Department of Health and

Mental Hygiene ("DOHMH"), brings several claims of employment discrimination pursuant to

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), New York

State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL"), and New York City

Human Rights Law, N.Y. City Admin. Code §§ 8-101, *et seq.* ("NYCHRL").  Lioi alleges that

she was discriminated against on the basis of her gender, and that she was subjected to a hostile

work environment and retaliation.  Defendant DOHMH is Lioi's former employer.  Defendants

Martin Evans and David Haddow are DOHMH employees who served in supervisory positions

during Lioi's term of employment.

 Defendants deny each of Lioi's claims, and now move for summary judgment under

Federal Rule of Civil Procedure 56(a).  For the reasons that follow, the Court grants defendants'

motion as to Lioi's Title VII claims and declines to exercise supplemental jurisdiction over

Lioi's NYSHRL and NYCHRL claims.

I.      **Background and Undisputed Facts**[1]

    **A.  Key Persons, Entities, and Terms**

    Lioi was employed as an Associate Staff Analyst ("ASA") in DOHMH's Public Health

Laboratory ("PHL") from December 2005 until April 2009, when she was terminated.  PHL

provides a variety of clinical and laboratory testing services for the DOHMH and is comprised of

several departments.  While employed at PHL, Lioi worked in the Laboratory Information

Management System Department ("LIMS Department"), a unit within PHL that provides

technical and systems support to the departments that perform actual specimen testing.  Def. 56.1

¶ 11; Pl. 56.1 ¶ 11.  The Laboratory Information Management System ("LIMS") "is the 'clinical

[computer] system that is used to record all the specimens that are processed in the lab and [the

end] results.'"  Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11 (quoting Lioi Dep. 59).

    John Somma is the former Director of PHL, and served as Lioi's direct supervisor from

the time of her hire until about January 2008.  Def. 56.1 ¶ 36; Pl. 56.1 ¶ 36.  In or around January

2008, defendant Martin Evans replaced Somma as Lioi's direct supervisor; Evans is the Director

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motion, including:  Defendant's Local Rule 56.1 Statement ("Def. 56.1") (Dkt. 21); the Declaration of Kuuku Minnah-Donkoh in Support of Defendant's Motion for Summary Judgment (Dkt. 22) ("Minnah-Donkoh Decl.") and attached exhibits; Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1") (Dkt. 27); the Declaration of Saul D. Zabell in Opposition to Defendant's Motion for Summary Judgment (Dkt. 26) ("Zabell Decl.") and attached exhibits; and the deposition of Francine Lioi (Minnah-Donkoh Decl. Ex. C; Zabell Decl. Ex. K) ("Lioi Dep.").  References herein to a paragraph in a party's 56.1 statement incorporate by reference the evidentiary materials in that paragraph.  Where facts stated in a party's Statement of Material Fact are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

of Technical Affairs and the Associate Director of the PHL.  Def. 56.1 ¶ 36; Pl. 56.1 ¶ 36.

Defendant David Haddow has served as the PHL's Director of Administration and Human

Resources since March 24, 2008.  Def. 56.1 ¶ 59; Pl. 56.1 ¶ 59.

### B.  Events Relevant to Lioi's Claims

#### 1.  Lioi's Employment

On February 18, 2005, DOHMH posted a job vacancy notice for an ASA position at

PHL.  Def. 56.1 ¶ 13; Pl. 56.1 ¶ 13.  The vacancy notice contained the following job description

for the ASA position:

> Participate in the design and implementation of the Laboratory Information
> System ("LIS") for the PHL.  Interface with program level staff to ensure user
> needs are met and vendor is on schedule and receiving adequate feedback from
> users.  Document business requirements and deliverables throughout the
> application development process.  Monitor implementation of system, conducting
> QA on system and providing training of users.  Maintain integrity of data
> collected and stored.  Perform daily back up of database using Windows 2003
> Server software.  Assist program and scientific personnel in the design and use of
> software applications and maintain necessary documentation.

Minnah-Donkoh Decl. Ex. G.

On or about July 7, 2005, Lioi submitted a pre-employment application to DOHMH,

indicating that she was seeking a position as a "LIS Specialist."  *See id.* Ex. D.  Lioi was

interviewed along with five other candidates for the ASA position—three candidates were male,

and three, including Lioi, were female.  Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17; *see also* Minnah-Donkoh

Decl. Ex. H.  Lioi was ultimately selected by Somma to fill the vacant ASA position.  Def. 56.1 ¶

17; Pl. 56.1 ¶ 17.

Lioi began her employment with DOHMH on December 5, 2005.  Def. 56.1 ¶ 20; Pl.

56.1 ¶ 20.  At her deposition, Lioi testified that during the interview process she was not made

aware that she was being interviewed for the ASA position.  Lioi Dep. 43.  Rather, Lioi testified

that the first time she became aware that she was being considered for an ASA position was when she went to fill out the employment paperwork on the date of her hire. *Id.* at 44. Lioi testified that she initially refused to sign the employment paperwork indicating that she was being hired as an ASA, stating that she "would not have taken a job if [she] had known it was an [ASA] position." *Id.* at 44–45. Nevertheless, Lioi signed the employment paperwork and confirmed her appointment as a provisional ASA with a starting salary of $65,000 per year. *See* Lioi Dep. 46; Minnah-Donkoh Decl. Ex. I.

### 2. Lioi's Alleged "Blocked" Transfer to DIIT and Gender-Related Comments

Lioi alleges that in January 2007, she was offered an opportunity to transfer to a position as a Computer Systems Manager in the Division of Informatics and Information Technology ("DIIT"), which paid a higher salary. However, she alleges, that transfer was blocked by Somma due to her gender. Am. Compl. ¶¶ 22–23.[2]

Lioi testified that this transfer opportunity was the result of a series of meetings she had with Hadi Makki, a former Assistant Commissioner of DIIT. Lioi Dep. 76. According to Lioi, at her third meeting with Makki she was informed by Makki that "Somma had contacted him and had put a stop to the transfer. [Somma] essentially blocked the transfer[.]" *Id.* at 79. Lioi testified that Makki informed her that the reason Somma "blocked" the transfer was that PHL wanted to keep her, and that PHL intended to match any offer DIIT was going to make. *Id.* Lioi further testified that no firm offer to transfer to DIIT was ever made. *Id.* at 79–80.

Lioi testified that sometime after the alleged blocked transfer, in January or February 2007, she confronted Somma about the transfer to DIIT. *Id.* at 112. According to Lioi, in

---

[2] DIIT is an entity within DOHMH, but is separate from PHL. Def. 56.1 ¶ 30; Pl. 56.1 ¶ 30.

response to her questions about the transfer, Somma responded by saying, "[t]his is an old boy's school." *Id.* at 112.

Lioi testified that she had a second verbal exchange with Somma a few weeks after Somma's "old boy's school" comment, in which she again questioned him about the transfer and her pay. *Id.* at 113. In response to these questions, Somma allegedly responded by saying, "[t]his is a man's world. Stop rocking the boat." *Id.* at 113–114.

In or around January 2008, Evans replaced Somma as Lioi's direct supervisor. Def. 56.1 ¶ 36; Pl. 56.1 ¶ 36. Somma left his position as the Director of PHL and began working in DOHMH's Department of TB Control. Def. 56.1 ¶ 37; Pl. 56.1 ¶ 37. Lioi asserts that although Somma was "allowed to transfer" to the Department of TB Control, she "was not afforded similar privileges and opportunities." Am. Compl. ¶ 25. At her deposition, Lioi testified that she does not know whether Somma had to apply for the position at the Department of TB Control along with other applicants. Lioi Dep. 100.

### 3. Lioi's Rejection of a $10,000 Raise and Initial Visit to the DOHMH Equal Employment Office

In December 2007, around the same time Evans replaced Somma, the Assistant Commissioner of PHL, Dr. Sara Beatrice, sought approval to grant Lioi a pay raise, from $65,000 to $75,000 per year. Def. 56.1 ¶ 35; Pl. 56.1 ¶ 35. In early January 2008, that request was approved, and the raise was subsequently communicated to Lioi. *See* Minnah-Donkoh Decl. Ex. K. Despite the offered raise, on January 8, 2008, Lioi sent an email to Beatrice, Peter Bachman (then Vice President of PHL), and Somma, to decline the raise. *Id.* Ex. M. In declining the raise, Lioi stated that even with a salary increase up to $80,000, she "would still be the lowest paid person in the department." *Id.* Lioi testified that, in making this comment, she was comparing her salary to the salaries of Jack Deutsch and Hang Lam. Lioi Dep. 87. Deutsch

was the Director of PHL's Lead Department and had been working at PHL and the LIMS Department since before Lioi's employment with PHL.  Def. 56.1 ¶ 40; Pl. 56.1 ¶ 40.  Lam was a Computer Specialist and had also been working at both PHL and the LIMS Department since before Lioi's employment there.  Def. 56.1 ¶ 40; Pl. 56.1 ¶ 40.

Lioi testified that in or about January 2008, she met with a DOHMH Equal Employment Office ("EEO") representative because she was "concerned about the hostile work environment [she] was working in at the time," and to discuss her dissatisfaction with her current pay and job title.  Lioi Dep. 136–137.  Lioi testified that at this meeting the EEO representative advised her that she should seek assistance from the New York Human Rights Office or the U.S. Equal Employment Opportunity Commission ("EEOC").  Lioi did not file a complaint following this meeting; the first complaint she filed with the DOHMH EEO was in December 2008, following her suspension by DOHMH.  *Id.* at 135.

### 4. Lioi's Allegations Against Peter Mura and Complaints of Unequal Pay

Lioi alleges that, sometime after receiving complaint forms from the EEOC and placing them in her locker, Peter Mura, a DIIT Computer Systems Manager who worked at PHL, broke into her locker and removed these forms.  Am. Compl. ¶¶ 28–29; Lioi Dep. 117.  Mura testified that he never broke into Lioi's locker.  *See* Minnah-Donkoh Decl. Ex. N; Zabell Decl. Ex. P (Deposition of Peter Mura) ("Mura Dep.") at 8–9.

Lioi alleges that she "was repeatedly overlooked for promotions within her [d]epartment, while less experienced, less qualified males were hired at increased salaries and more significant titles."  Am. Compl. ¶ 24.  At her deposition, Lioi identified Altaf Shaikh and Kevin Ward as the "less experienced, less qualified males" that she was referring to.  Lioi Dep. 96.

Altaf Shaikh was hired by DIIT in March 2008 as a Computer Systems Manager with a starting salary of $75,000. Minnah-Donkoh Decl. Ex. O (Deposition of Altaf Shaikh) ("Shaikh Dep.") at 14. Shaikh's salary was paid by DIIT and not PHL. Def. 56.1 ¶ 55; Pl. 56.1 ¶ 55. Upon beginning his employment, Skaikh was assigned to work at PHL. Shaikh Dep. 13–14. Towards the beginning of Skaikh's time at PHL, Lioi was asked by Evans to assist in training Shaikh on the microbiology component of LIMS. Lioi Dep. 104–105; *see also* Minnah-Donkoh Decl. Ex. L; Zabell Decl. Ex. L (Deposition of Martin Evans) ("Evans Dep.") at 22–23.

With respect to Kevin Ward, Lioi testified that she was unsure how long he had been working at PHL, or what his official title was. Lioi Dep. 56, 96–97. Lioi testified that at some point there was a vacancy posting for a LIS manager position for which she was qualified, and that she had intended to apply for it, but that she was advised by a co-worker, at the direction of Somma, not to apply. *Id.* at 98–99. Apparently, the co-worker advised Lioi that the position was "created" by Somma for Ward. *Id.* at 99. Lioi never spoke to Somma directly about the LIS manager position. *Id.*

Lioi alleges that in or about April 2008, she complained to Evans and Haddow, the latter of whom was serving in the capacity as Director of Administration and Human Resources, "about the escalating discriminatory treatment and harassment to which she was subjected." Am. Compl. ¶ 30. Lioi alleges that no action was taken in response to this complaint. *Id.* Evans testified that Lioi had complained to him about her pay at some point during her time under his supervision, and that he had attempted to remedy to situation. Evans Dep. 25–26. Haddow similarly testified that Lioi had gone to him on several occasions with complaints about her pay and job title. *See* Minnah-Donkoh Decl. Ex. P; Zabell Decl. Ex. M (Deposition of David Haddow) ("Haddow Dep.") at 19–21.

On May 13, 2008, Lioi sent an email to Evans asking if Evans would, as her supervisor, provide her with a letter of recommendation for a graduate scholarship.  Minnah-Donkoh Decl. Ex. Q.  Evans assented to the request and on May 15, 2008, Evans provided a letter of recommendation, supporting Lioi for the scholarship.  Minnah-Donkoh Decl. Ex. R.  Evans testified that he had also "recommended" Lioi on a separate occasion, in connection with an attempt to obtain a pay raise for Lioi.  Evans Dep. 17.

Lioi alleges that in or about September 2008, she "reported to David Haddow and Martin Evans that the computer she was assigned ha[d] been breached by DIIT employee Peter Mura, as part of an ongoing campaign of harassment."  Am. Compl. ¶ 31.  When asked why she believed it was Mura who had breached her computer workstation, Lioi testified:  "Because Peter Mura was constantly trying to get the information from me and when I stopped providing the information that he wanted, that's when I started noticing [the breaches] and I confronted him, and I asked him flat out and he denied it and I informed him that I didn't believe him, because prior to him being there, I never had issues like that."  Lioi Dep. 132.  Lioi testified that she never viewed Mura's log-in information on her computer, and that the automated messages she had received of attempted log-ins did not indicate that it was Mura who attempted to log in.  *Id.* at 133.  Mura testified that he has never accessed anything of Lioi's—including her computer. Mura Dep. 9.

### 5.  Lioi's Allegations of Additional Discriminatory Comments

In addition to the alleged gender-related comments made by Somma in 2007, Lioi alleges that she was referred to as "a man."  Am. Compl. ¶ 20.  Specifically, Lioi testified that on a "couple" of occasions in or around October or November 2008, Evans would use the word "man" in front of a group of employees, and then "[h]e would look over in my direction and he

8

would stand there and address the group.  Whenever he said it, he would look in my direction and just smirk at me and I would just shrug it off."  Lioi Dep. 114–116.  Lioi testified that the comments allegedly made to her by Somma in 2007, and the "couple of times" Evans allegedly referred to her as a "man," were the only discriminatory comments she could recall.  *Id.* at 116.

### 6.  Lioi's Alleged Misuse of Her Work Email

Between October 24 and 29, 2008, a number of emails were exchanged between Lioi, her co-workers, and supervisors.  *See* Minnah-Donkoh Decl. Ex. T.  In one email, Lioi wrote to a number of her co-workers:

> Someone caused YET another incident on Friday but was probably unable to fix it (a common occurrence these days in LIMS).  With that said, if someone needs to be given step-by-step instruction how to fix some of these issues, then obviously that person(s) should NOT be given free liberty to keep causing these types of problems.  There is a certain expectation of competency based on a person's title and level of responsibility.

*Id.* at 0695–96.

After one of Lioi's co-workers responded to Lioi's email, and a subsequent "reply all" by Lioi, Evans replied to all, stating that "[e]mails like this have no place in a professional workplace and this needs to end immediately."  *Id.*  Lioi then forwarded the chain of emails to co-worker Hang Lam, stating:  "Like I said, Joe has turned into a major jerk since you've been gone!  With you gone, I guess they feel like they can attack me since they have [E]van's support."  *Id.*  Evans testified that "[Lioi] became very divisive, and being very competent, she thought everybody else was incompetent.  She vocalized that, and that upset people; to have somebody who is very good, denigrate you in that manner, so that caused issues and divisiveness in the unit."  Evans Dep. 53.

Lioi testified that in or around October or November 2008, she was "instructed" by Evans to work with Hang Lam, a co-worker who was out on medical leave.  Lioi Dep. 152.  Evans

testified that there was an issue with "one of the reports that we needed," and that, because Lam would have been the point person on this report, Evans asked Lioi to work with Lam on it. Evans Dep. 37–38.  Once the issue arose with accessing Lam's part of the system, Evans further testified, "[Lioi] was good enough to volunteer that, [']I'm in contact with him, and maybe he can help me so we can resolve the problem.[']"  *Id.* at 38.

On October 29, 2008, Lioi sent an email from her work email address to Lam's personal Yahoo email account.  *See* Minnah-Donkoh Decl. Ex. U.  The subject line of the email was "FW: today's STD list" and contained two file attachments.  *Id.*  The City asserts that these two attachments contained several pages of data which included "patient specific identifiers for specimens requested to be tested by several STD [sexually transmitted disease] clinics throughout the City of New York."  Def. 56.1 ¶ 72.  Lioi disputes that the email in question contained any patient-specific identifiers.  Pl. 56.1 ¶ 72.  When asked if she did in fact send this email, Lioi testified:

> A:   I was told that I did.
> Q:   You are not aware that you did?
> A:   I was not aware that I did.
> Q:   Have you since become aware that you did?
> A:   Yes.  I was told that I did.

Lioi Dep. 150.

On October 30, 2008, Lioi sent a series of emails from her work email account to Lam's Yahoo address.  The first email stated, *inter alia*, that ". . . [y]esterday bald head called and spoke with the evil dumb one, Alf[.]"  Minnah-Donkoh Decl. Ex. V.  Lioi testified that "bald head" was a reference to Peter Mura, and that "evil dumb one" was a reference to Altaf Shaikh. Lioi Dep. 156.

A couple of minutes later, Lioi sent a second email to Lam, entitled "FW:  Today's List." Minnah-Donkoh Decl. Ex. W.  This email contained one attachment, which also contained several pages of data, including, the City asserts, more patient specific identifiers for specimens to be tested by STD clinics.  Def. 56.1 ¶ 74.  Lioi also disputes that this email contained any patient-specific identifiers.  Pl. 56.1 ¶ 74.  For her part, Lioi argues that "she was never instructed not to work on patient files by Mr. Evans," and further, that she kept Evans and Beatrice "apprised of the status of her work with Mr. Lam."  Pl. 56.1 ¶ 75.  However, Lioi admits that Evans never told her that it was okay to send confidential patient information to Lam's personal Yahoo account.  Lioi Dep. 153.

On December 6, 2006, Lioi had signed PHL's Employee Confidentiality Statement.  *See* Minnah-Donkoh Decl. Ex. X.  The confidentiality statement provides, in relevant part:

> Unauthorized disclosure of confidential information is a violation of New York City Health Code 11.07 and may also violate applicable State and Federal laws for which you as an individual may be subjected to civil and/or criminal penalties, forfeitures and appropriate disciplinary action, *including termination of your employment with the New York City DOHMH*.

*Id.* (emphasis added).  Below the confidentiality statement, there was an Employee Confidentiality Agreement, which Lioi signed.  *Id.*

DOHMH also had an Acceptable Use Policy ("the Policy") in place, effective as of March 2007, which outlined the acceptable uses of DOHMH office and technology resources. *See* Minnah-Donkoh Decl. Ex. Y; *see also* Def. 56.1 ¶ 78; Pl. 56.1 ¶ 78.  Section VI of the Policy "provides guidelines regarding the appropriate and inappropriate use of Agency email, and also defines rules for the protection of confidential data distributed via e-mail."  *See* Minnah-Donkoh Decl. Ex. Y at 0743.  Section VI(B), "Webmail," provides, "Disciplinary action may taken if it is found that: . . . An employee is sending confidential or sensitive Agency data to any webmail or

11

personal e-mail account." *Id.* at 0744.  Yahoo is specifically listed as an example of "webmail."

*Id.*

> The Policy defines "confidential data" as:
>
> . . . [A]ny combination of medical, demographic, financial, or other information that can personally identify, or for which there is a reasonable basis to believe can be used to identify, Agency employees or members of the populations they serve. Examples of this include, but are not limited to, a person's medical record number, diagnosis, Social Security Number, date of birth, full name, street address, telephone number, personal e-mail address, or other information that could uniquely identify individuals.

*Id.* at 0740–41.

The Policy also makes clear that employees do not have a right of privacy while using

DOHMH technology resources, "whether for business or personal purposes, at any time,

including accessing the Internet or using e-mail." *Id.* at 0744.  Finally, Section IX of the Policy

provides for enforcement tools and sanctions to carry out the policy.  *Id.* at 0745.  For example,

Section IX states:  "Unauthorized use of the Agency's office and technology resources may

result in . . . disciplinary or other adverse personnel actions, up to and including dismissal[.]"  *Id.*

### 7.  Lioi's Suspension and Termination

On November 20, 2008, Lioi was interviewed by Stephan Zander, the Deputy Inspector

General of the DOHMH.  *See* Minnah-Donkoh Decl. Ex. Z.[3]  At the interview, Lioi admitted that

she had sent a number of emails to Lam's personal email account.  *See id.* at 14–16.  At the

conclusion of the meeting, Zander notified Lioi that she was being suspended, and provided her

with a letter of suspension signed by Rose Tessler, Director of DOHMH's Employment Law

---

[3] Lioi objected to the transcript of the interview as it had not been "verified or authenticated." Upon an order from this Court, dated September 12, 2012, the City submitted an audio CD with a recording of the interview.  In a letter to the Court, dated September 19, 2012, Lioi acknowledged that she "do[es] not believe the transcript of the audio record to be substantively inaccurate," but stated that she objects "to the methodology utilized by the examiner in conducting the interview."

Unit.  *See id.* at 31–32.  Zander also notified Lioi that the Employment Law Unit would contact her to serve her with formal charges.  *Id.* at 33–34.

On December 9, 2008, Lioi filed gender discrimination complaints against Evans and Haddow with DOHMH's EEO.  *See* Minnah-Donkoh Decl. Ex. CC–DD.  In a letter dated December 31, 2008, Haddow responded to the allegations in Lioi's complaint, calling the allegations "not only baseless but . . . false[.]"  Minnah-Donkoh Decl. Ex. EE.  On February 27, 2009, Evans responded to the allegations by letter, and similarly categorized Lioi's claims as false.  *See* Minnah-Donkoh Decl. Ex. FF.

On or about January 15, 2009, Lioi was served with a Notice and Statement of Charges.  Minnah-Donkoh Decl. Ex. GG.  The Notice charged Lioi with three separate violations of the Standards of Conduct Rules, including violations of the department's Confidentiality Agreement and the federal Health Insurance Portability and Accountability Act ("HIPAA").  *Id.*  The Notice informed Lioi that per the grievance procedures set forth in her union's contract with the City, there would be an informal conference held on January 29, 2009.  *Id.*  Michael Aragon was the Informal Conference Leader.  *Id.*  On January 29, 2009, the conference was held, and on February 10, 2009, Aragon informed Lioi, by letter, that after reviewing the evidence presented at the conference, he was recommending that she be terminated by DOHMH.  *See* Minnah-Donkoh Decl. Ex. HH.

On February 13, 2009, Lioi waived her rights to a disciplinary hearing pursuant to Section 75 of the Civil Service Law.  *See* Minnah-Donkoh Decl. Ex. II.  Following a "Step II" disciplinary hearing on March 10, 2009, Labor Relations Officer Nellie Mitchell notified Lioi's union representative that Lioi was to be terminated from her job as a DOHMH employee effective April 2, 2009.  *See* Minnah-Donkoh Decl. Ex. JJ.  The letter stated that it had been

13

determined that Lioi violated the Confidentiality Agreement by (a) sending emails with patient specific identifiers to Lam on October 29 and October 30, and (b) storing confidential data on the unencrypted local hard drive of her work computer.  *Id.*

In a letter dated April 3, 2009, Lioi was notified by Brenda McIntyre, Assistant Commissioner of DOHMH's Bureau of Human Resources, that she was terminated effective as of that date.  *See* Minnah-Donkoh Decl. Ex. KK.

On August 31, 2009, Lioi filed a complaint with the EEOC alleging that she was (a) discriminated against on the basis of her sex and race, and (b) the subject of retaliation.  *See* Minnah-Donkoh Decl. Ex. LL.  On March 30, 2010, Lioi filed a formal charge of discrimination against DOHMH PHL with the New York State Division of Human Rights.  *See* Minnah-Donkoh Decl. Ex. NN.  On May 11, 2010, the EEOC notified DOHMH that Lioi had filed a charge of employment discrimination against them, and that no action was required of DOHMH at that time.  *See* Minnah-Donkoh Decl. Ex. OO.  On June 10, 2010, EEOC notified Lioi that it had determined that "it is highly unlikely that subsequent investigation or investment of further resources would result in a finding under the Federal laws that we enforce."  *See* Minnah-Donkoh Decl. Ex. QQ.  EEOC provided Lioi with a Notice of Right to Sue.  *Id.*

## II.    Procedural History

On August 30, 2010, Lioi filed the Complaint in this case.  Dkt. 1.  On April 13, 2011, Lioi filed an Amended Complaint.  Dkt. 10.  On July 12, 2012, defendants filed a motion for summary judgment.  Dkt. 20–23.  On July 26, 2012, Lioi filed her opposition to the motion.  Dkt. 24–27.  On August 2, 2012, defendants filed a reply.  Dkt. 28.  On November 28, 2012, the Court heard oral argument on the motion.

### III.     Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

IV.     **Discussion**

Lioi brings claims under Title VII for gender discrimination, hostile work environment, and unlawful retaliation, as well as claims under New York State and New York City Human Rights Laws.[4]  The Court addresses each, in turn.

### A.  Gender Discrimination Under Title VII

When there is no direct evidence of discrimination, discrimination claims under Title VII are guided by the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this analysis, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  To do so, Lioi must show "(1) that she was within the protected [class], (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination."  *See Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010). "This burden is not a heavy one."  *Id.*  However, a plaintiff cannot establish a *prima facie* case based on "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. denied,* 474 U.S. 829 (1985).

If the plaintiff can demonstrate a *prima facie* case, "the burden of production shifts to the employer to articulate a legitimate, clear, specific and non-discriminatory reason" for having

---

[4] Lioi brings these claims against DOHMH, Martin Evans, and David Haddow.  As Lioi now concedes, DOHMH, as an agency of the City of New York, may not be sued in its independent capacity.  Nevertheless, because Lioi could amend the Complaint to correct this deficiency, and because the issues have been briefed as if the proper defendant had been named, the Court considers Lioi's claim as if she had properly named the City of New York.  *See Healy v. City of New York Dep't of Sanitation*, No. 04 Civ. 7344 (DC), 2006 WL 3457702, at *5 n.3 (S.D.N.Y. Nov. 22, 2006).

Lioi's Title VII claims against Evans and Haddow, however, must be dismissed.  In the Second Circuit, Title VII does not impose liability on individuals.  *See Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012).  Although Lioi invites this Court to reconsider that binding precedent, that is a matter for the Court of Appeals.

undertaken the adverse action.  *Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996).

"[I]f the defendant satisfies this burden of production, the plaintiff has the ultimate burden to

prove that the employer's reason was merely a pretext for discrimination."  *Id.*  A plaintiff is not

"required to prove the prohibited motivation was the sole or even the principal factor in the

decision, or that the employer's proffered reasons played no role in the employment decision."

*Finn v. N.Y. State Office of Mental Health Rockland Psychiatric Ctr.*, No. 08 Civ. 5142, 2011

WL 4639827, at *11 (S.D.N.Y. Oct. 6, 2011) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 78

(2d Cir. 2001)).  Instead, the plaintiff "must show that those were not the only reasons and that

plaintiff's protected status contributed to the employer's decision."  *Id.*

### 1.   Lioi has failed to establish a prima facie case of gender discrimination

The City concedes that Lioi is a member of a protected class and that she was qualified

for her position as an ASA.  Thus, to make out a *prima facie* case, Lioi must establish that she

was subject to an adverse employment action, and that the adverse employment action took place

under circumstances giving rise to an inference of discrimination.

An adverse employment action is a "materially adverse change in the terms and

conditions of employment."  *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d

Cir. 2004) (citation omitted).  "To be materially adverse, a change in working conditions must be

more disruptive than a mere inconvenience or an alteration of job responsibilities."

*Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders*, 361 F.3d at 755).

"Examples of such a change include termination of employment, a demotion evidenced by a

decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices unique to a particular situation."  *Id.*

Lioi argues that she was the target of numerous adverse employment actions, including (1) working under an inferior job title with an inferior salary; (2) the blocked transfer to DIIT; (3) her suspension; and (4) her termination.  Pl. Br. 7–9.[5]  This Court addresses each, in turn.

First, Lioi asserts that during her entire tenure at PHL, she worked under a less distinguished job title, and at a lower salary, than similarly situated male co-workers.  Even assuming that this constitutes an adverse employment action—which the City disputes, *see* Def. Br. 2—Lioi has failed to establish the fourth element of a *prima facie* case of discrimination.  To established an inference of discrimination based on a showing of disparate treatment, Lioi "must show that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citation omitted).  What constitutes "all material respects" varies from case to case, but "must be judged based on [] whether the plaintiff and those [s]he maintains were similarly situated were subject to the same workplace standards."  *Id.* at 40.  "[W]here a plaintiff seeks to establish the minimal *prima facie* case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."  *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001).

Here, none of the co-workers that Lioi points to were similarly situated in all material respects.  Lioi testified that she received a smaller salary than those of Jack Deutsch and Hang

---

[5] Lioi's Complaint alleges that she was "repeatedly overlooked for promotions."  Am. Compl. ¶ 24.  To the extent that Lioi's papers assert a "failure to promote" theory, she neither properly pleads nor argues this point.  Even if she did, however, any failure to promote claims would fail as a matter of law, because Lioi offers no evidence that she ever applied for any other job.  *See, e.g.*, *Estate of Hamilton v. City of N.Y.*, 627 F.3d 50, 55 (2d Cir. 2010) (noting that, to make out a failure to promote claim, a person must have applied for a job for which the employer was seeking applications).

Lam.  Lioi Dep. 87.  But neither Deutsch nor Lam was similarly situated.  Deutsch was the

Director of PHL's Lead Department and had been working at PHL prior to Lioi's employment

there.  Lam was a Computer Specialist, rather than an Associate Staff Analyst, and had also been

working at PHL for longer than Lioi.

Lioi also compares herself to Altaf Shaikh and Kevin Ward, Lioi Dep. 96, but neither of

these individuals is a proper comparator, either.  Although Shaikh's annual salary was $10,000

more than Lioi's, Lioi *turned down* a $10,000 raise offered to her in January 2008.  Moreover,

Shaikh was employed by DIIT, not PHL.  As for Ward, Lioi testified that she did not know what

his job title was, nor how long he had been working at PHL.  *Id.* 56, 96–97.  Such speculation is

insufficient to raise an inference of discrimination.  *See Sharpe v. MCI Commc'ns Servs., Inc.*,

684 F. Supp. 2d 394, 405 (S.D.N.Y. 2010) (plaintiff's speculation about colleagues'

qualifications insufficient to raise inference of discrimination).  In sum, although Lioi points to a

number of male co-workers who performed somewhat similar work, there are important

distinctions between each of these individuals and Lioi.  Therefore, to the extent Lioi's

discrimination claim is based on her allegations of working out of title for an inferior salary, she

has failed to establish circumstances giving rise to an inference of discrimination.

Second, Lioi alleges that she suffered an adverse employment action when Somma

blocked her transfer to DIIT in January 2007.  This allegation, even if true, is untimely.  For a

Title VII claim to be timely, "a claimant [must] file a charge of discrimination with the EEOC

within 180 days of the alleged unlawful employment action or, if the claimant has already filed

the charge with a state or local equal employment agency, within 300 days of the alleged

discriminatory action."  *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996);

*see* 42 U.S.C. § 2000e-5(e).  Lioi filed an Intake Questionnaire with the EEOC on August 31,

2009.  Thus, events occurring before November 4, 2008 are time-barred, as Lioi conceded at oral argument.  Tr. 37.  Discrete discriminatory acts, such as a denial of transfer, "are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  Therefore, even if there were evidence, which there is not, that the denial of transfer was somehow related to Lioi's gender, it would be, at most, "background evidence in support of a timely claim."  *Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d. Cir. 2004) (quoting *Nat'l R.R.*, 536 U.S. at 113).

The third alleged adverse employment action is Lioi's suspension.  Although a suspension is undoubtedly an adverse action, Lioi cannot point to circumstances giving rise to an inference of discrimination.  Lioi was suspended in November 2008 after she sent the emails containing patient identifiers to Lam's personal email account.  Lam was also suspended.  As counsel for Lioi conceded at oral argument, that both Lioi and her male co-worker were suspended for the same incident significantly undermines Lioi's claim that the suspension was tied to gender.  Tr. 19 ("The Court: The fact that Mr. Lam was suspended tells you at least that the suspension component here wasn't about gender.  Right?  Mr. Zabell: Yes.").  And to the extent Lioi argues that the gender-related comments made by Somma and Evans give rise to an inference of discrimination as to her suspension, that argument also fails, for reasons discussed *infra*.

Finally, Lioi suffered an adverse employment action when she was terminated.  Once again, however, she cannot establish an inference of discrimination.  Because Lioi was terminated, whereas Lam was only suspended, Lioi argues that the incremental difference between these two punishments is disparate treatment that gives rise to an inference of

discrimination.  But Lioi, the active sender of the violative email, and Lam, its passive recipient, are, plainly, not similarly situated in all material respects.  *See Graham*, 230 F.3d at 39.

Lioi also attempts to prove an inference of discrimination on the basis of the gender-related comments made by Somma and Evans.  Here, too, she is unsuccessful.  Discriminatory remarks are admissible in gender discrimination cases because they may tend to show discriminatory animus.  Whether remarks by defendants or defendants' employees support an inference of discrimination depends on the context, and whether, fairly considered, these remarks are either themselves probative of discrimination, or "tend[] to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class."  *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 116 (2d Cir. 2007).  In determining whether a particular remark is probative of discrimination, courts consider four factors:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).

The first pair of discriminatory comments was made by John Somma in early 2007.  They were clearly gender-related.  Lioi Dep. 112 ("This is an old boy's school."); *id.* at 113–14 ("This is a man's world.  Stop rocking the boat.").  At the time, Somma was Lioi's direct supervisor.  However, Somma left PHL in December 2007—almost a full year before Lioi was suspended, and more than a year before her termination.  Further, there is no evidence that Somma had anything to do with the decision to terminate Lioi, nor that his comments were in any way related to the decision-making process.

The other allegedly discriminatory comments were made by Martin Evans, who, on a couple of occasions in October or November 2008, would use the word "man" in front of a group of employees and then look in Lioi's direction and smirk.  Lioi Dep. 114–116.  The content of these remarks is barely gender-related, and there is no evidence that they were made in a context that was at all related to the decision-making process that resulted in Lioi's suspension or termination.  Although Evans was Lioi's supervisor when he made the comments and at the time of her termination, there is no evidence that he played any role in the decision to terminate Lioi.[6]  Although counsel for Lioi tried to salvage this argument by implying that the decision-makers were generally under the suasion of Evans (and Haddow), *see* Tr. 33–35, the record contains no evidence that this was the case.[7]

Lioi, therefore, has failed to establish a *prima facie* case of discrimination.

**2.  Even if Lioi could make out a *prima facie* case, the City has put forward a neutral justification for Lioi's termination which Lioi has failed to show is pretextual**

---

[6] Further negating the suggestion that Evans had anything to do with Lioi's termination is the fact that he wrote a letter of recommendation on Lioi's behalf earlier that year.  Indeed, Evans testified that, "[t]echnically, she was excellent.  She was one of the best people we had.  That's why I wanted to keep her."  Evans Dep. at 52.

[7] The record is unclear regarding who made the decisions to suspend and terminate Lioi. Stephan Zander informed Lioi at the conclusion of their interview that she would be suspended, *see* Minnah-Donkoh Decl. Ex. Z; however, as he did so, he handed Lioi a letter signed by Rose Tessler informing her of that suspension, *see id.* Exs. Z, AA.  Thus, it is unclear as between Zander and Tessler who made the decision to suspend Lioi.  Similarly, Michael Aragon, after presiding over the informal conference set forth in the union's grievance procedures, recommended that Lioi be terminated.  *Id.* Ex. HH.  Lioi then had a Step II disciplinary hearing, the result of which was a letter signed by Nellie Mitchell informing Lioi's union representative that Lioi would be terminated.  *Id.* Ex. JJ.  And the official letter from the City notifying Lioi of her termination was signed by Brenda McIntyre.  *Id.* Ex. KK.  Once again, it is unclear as between these individuals who made the decision to terminate Lioi.  What is clear, however, is that Lioi has offered no evidence to support the assertion that Somma, Evans, or Haddow had any influence over any of these proceedings.

Assuming, *arguendo*, that Lioi could make out a *prima facie* case of gender discrimination with regard to her suspension or termination, the burden would shift to the City to show a legitimate, non-discriminatory reason for its actions.[8]  To satisfy that burden, the City argues that Lioi was terminated because she breached her confidentiality agreement with DOHMH when she sent emails containing patient specific identifiers from her email to Hang Lam's personal Yahoo account.  As a governmental entity responsible for safeguarding confidential patient health information, it is both reasonable and prudent for DOHMH to adopt and enforce policies that achieve that end.  As noted above, the confidentiality agreement which Lioi signed on December 6, 2006, clearly indicated that "[u]nauthorized disclosure of confidential information" may lead to a variety of disciplinary actions, including termination.  Minnah-Donkoh Decl. Ex. X.  Under that Policy, confidential data is described as "any combination of medical, demographic, financial or other information that can personally identify, *or for which there is a reasonable basis to believe can be used to identify*, Agency employees or members of the populations they serve."  *Id.* Ex. Y (emphasis added).  Lioi's breach of that policy is a neutral, legitimate justification for her termination.  *See, e.g.*, *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 65 (2d Cir. 1997) (violation of company policy is a legitimate non-discriminatory justification).

In response, Lioi makes two primary arguments.  First, Lioi argues that the data contained in the emails simply did not contain patient-specific identifiers, and thus do not fall with the meaning of "confidential data" defined by the Acceptable Use Policy.  The emails in

---

[8] Because both parties' briefing focused solely on whether the City had a neutral justification for Lioi's suspension and termination, the Court declines to address whether, assuming *arguendo* that Lioi had established a *prima facie* case of discrimination based on her working-out-of-title or denied-transfer theories, the City had a neutral justification for those actions.  The Court's holding that Lioi failed to establish a *prima facie* case on those theories of liability is sufficient to resolve this motion.

23

question each contain lengthy attachments with daily lists of specimens to be tested by STD

clinics.  *See* Minnah-Donkoh Decl. Exs. U, W.  Although the lists do not contain information

that would identify a particular patient as readily as names or Social Security numbers, they do

contain a 10-digit external ID number for each entry.  Although counsel for the City was unable

at oral argument to articulate precisely how these numbers could be used to identify individuals,

*see* Tr. 6–10, that failing is not fatal to its motion:  Lioi's argument is essentially that the City

misapplied its policy, but "courts have consistently held that they may not second-guess an

employer's non-discriminatory business decisions, regardless of their wisdom, unless there is

actual evidence that they were motivated by discrimination."  *Peters v. Mount Sinai Hosp.*, No.

08 Civ. 7250 (CM), 2010 WL 1372686, at *9 (S.D.N.Y. Mar. 30, 2010) (citing *Montana v. First

Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 106 (2d Cir. 1989)); *see also Swanston v. Pataki*, No. 97

Civ. 9406 (JSM), 2001 WL 406187, at *4 (S.D.N.Y. Apr. 20, 2001) (noting that the possibility

that a rational person could disagree with employer's determination that plaintiff violated a

company policy does not preclude summary judgment; employer's burden of neutral justification

is met so long as its reading of the policy is "reasonable").  As noted above, there is no evidence

that the City's decision to terminate Lioi was motivated by discrimination, and, therefore, the

Court will not second-guess the City's determination that the emails sent by Lioi violated the

confidentiality policy.

Lioi also argues that, whether or not her emails violated the letter of the policy, she had

permission from Evans, her supervisor, to send them.  However, although Evans did ask Lioi to

work with Lam while Lam was on leave, *see* Lioi Dep. 152, Evans Dep. 37, Lioi herself testified

that Evans never gave her permission to send confidential patient information to Lam's personal

account, *see* Lioi Dep. 153.  At argument, counsel for Lioi argued that Evans, in asking Lioi to

work with Lam, must have understood that Lam could not do his job from home without the confidential information Lioi sent him, and, thus, Evans implicitly authorized Lioi's actions.  Tr. 16–17.  However, as counsel conceded, there is no evidence to support that argument.  *Id.* at 17 ("The Court: [Y]ou need to show that the supervisor . . . tacitly approved it being sent. . . . Does the record show that?  Mr. Zabell: No.").

Therefore, the City has met its burden of demonstrating a neutral, non-discriminatory justification for Lioi's termination.  This shifts the burden back to Lioi to prove that the City's decision to terminate her based on the violation of the confidentiality policy was merely a pretext for gender discrimination.  As stated above, Lioi has offered no evidence that her termination was the product of discrimination.  Accordingly, summary judgment is merited in the City's favor on Lioi's Title VII gender discrimination claim.

### B.  Hostile Work Environment Under Title VII

In order to prevail on a hostile work environment claim under Title VII, Lioi must establish two elements.  She must prove (1) "that the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment," and (2) "that a specific basis exists for imputing the conduct that created the hostile work environment to the employer."  *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (citation omitted).  Title VII "does not set forth 'a general civility code for the American workplace.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  Rather, "[t]he plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby

altered." *Alfano v. Costello*, 294 F.3d 365, 373–74 (2d Cir. 2002) (citing *Leibovitz v. N.Y.C.*

*Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001)).

> This test has both objective and subjective elements:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). As a general rule, incidents must be more

than "episodic; they must be sufficiently continuous and concerted in order to be deemed

pervasive." *Perry*, 115 F.3d at 149 (citation omitted); *see also Faragher v. City of Boca Raton*,

524 U.S. 775, 788 (1998) (noting that "we have made it clear that conduct must be extreme to

amount to a change in the terms and conditions of employment"). *But see Quinn v. Green Tree*

*Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) ("[E]ven a single episode of harassment, if severe

enough, can establish a hostile work environment.").

In analyzing a hostile work environment claim, the Court is "required to look to the

record as a whole and assess the totality of the circumstances, considering a variety of factors,

including the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102

(2d Cir. 2010) (citation omitted).

In the Amended Complaint and her brief in opposition to this motion, Lioi bases her

hostile work environment claim on: (1) gender-based comments made by Somma and Evans;

(2) Mura's alleged breach of her work locker and computer; and (3) her suspension and

termination.

### 1.  Timeliness

As a threshold matter, the City argues that Lioi's hostile work environment claim is time-barred, because each of the alleged comments and incidents that Lioi points to falls outside of the statutory period, which the parties agree began on November 4, 2008.  *See supra* pp.19–20; Tr. 37.  However, under the "continuing violation" exception to Title VII, "[a] claim of hostile work environment is timely so long as one act contributing to the claim occurred within the statutory period; if it did, 'the entire time period of the hostile environment may be considered by a court for purposes of determining liability.'"  *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (quoting *Nat'l R.R.*, 536 U.S. at 117).

Somma made the alleged gender-based comments to Lioi in early 2007.  Lioi Dep. 112–114.  Mura's alleged breach of Lioi's locker occurred in early 2008.  *Id.* at 117.  Mura's alleged breach of Lioi's computer occurred in May, June, or July 2008, *id.* at 134, and Lioi alleges that she reported this breach to her supervisors in September 2008, Am. Compl. ¶ 31.  Each of these dates falls outside the statutory period.  Thus, they do not support Lioi's hostile work environment claim unless there is a timely act that is part of the same unlawful employment practice.

Lioi's suspension and termination both occurred after November 4, 2008, and thus are within the statutory period.  However, "the mere fact that an employee was dismissed within the statutory period cannot be used 'to pull in [a] time-barred discriminatory act.'"  *Patterson*, 375 F.3d at 220 (quoting *Nat'l R.R.*, 536 U.S. at 113).  Therefore, Lioi must do more than point to her suspension or termination; she must "proffer[] [some] evidence" to show that her suspension or termination "was in furtherance of the alleged practice of [] harassment."  *Id.*  She has not done so.

The only discriminatory acts that arguably fall within the statutory period are the instances in which Evans referred to Lioi as a man.  *See* Lioi Dep. 114–16.  These incidents occurred in October or November 2008.  *See id.* at 116 ("October, November.  It was around that time frame."); Am. Compl. ¶ 21 ("in or about October 2008").  Drawing all inferences in Lioi's favor, the Court will assume that at least one of these incidents did occur after November 4, 2008.  *But see* Tr. 37 ("The Court: Do you have anything that supports the hostile work environment claim that postdates November 3, 2008?  Mr. Zabell: No.").  For this incident to bring Lioi's claim, and thus the other alleged acts, within the continuing violation exception, Lioi must show that it was part of an "ongoing policy" of discrimination.  *Patterson*, 375 F.3d at 220.  Although the Court is skeptical that these comments were indeed part of an ongoing policy of discrimination, the Court need not resolve that question.  That is because the Court finds that, even assuming every single incident alleged by Lioi were timely, Lioi's claim still fails on the merits.

### 2.  Even Assuming the Alleged Acts Were Timely, Lioi's Hostile Work Environment Claim Fails

Lioi's hostile work environment claim consists primarily of the discriminatory comments made by Somma and Evans.  Specifically, Somma told Lioi that "this is an old boy's school," Lioi Dep. 112, and, on another occasion, "[t]his is a man's world.  Stop rocking the boat."  *Id.* at 113–14.  Lioi testified that each of these comments was made to her only once.  *Id.* at 112–14.  As for Evans, Lioi also testified that, on a couple of occasions, Evans would use the word "man" in front of a group employees, look in Lioi's direction, and smirk.  *Id.* at 114–16.

These comments fall far short of the frequency or severity required for a claim of hostile work environment.  Indeed, courts in this circuit have granted summary judgment to employers despite conduct far more severe than that alleged here.  *See, e.g.*, *Dayes v. Pace Univ.*, No. 98

Civ. 3675, 2000 U.S. Dist. LEXIS 3698, at *2–3, *11–12 (S.D.N.Y. Mar. 24, 2000), *aff'd*, 2 F.

App'x 204 (2d Cir. 2001) (granting summary judgment to defendant where plaintiff was subject

to six sexual comments, multiple requests for dates, was screamed at by a supervisor, and was

touched on the back); *Lucas v. S. Nassau Cmty. Hosp.*, 54 F. Supp. 2d 141, 147–48 (E.D.N.Y.

1998) (denying NYSHRL hostile work environment claim where supervisor brushed against

plaintiff three times, touched plaintiff three times, briefly touched plaintiff's back or shoulders

five to seven other times, asked about the color of plaintiff's underwear, said plaintiff wanted to

"go to bed" with her, and said "fuck you" to plaintiff on two occasions); *Ricard v. Kraft Gen.*

*Foods, Inc.*, No. 92 Civ. 2256, 1993 U.S. Dist. LEXIS 21062, at *9 (S.D.N.Y. Mar. 16, 1993),

*aff'd*, 17 F.3d 1426 (2d Cir. 1994) (four sexually-oriented incidents insufficient to withstand

summary judgment).  Further, the frequency of the incidents alleged by Lioi is more properly

categorized as "episodic," rather than the type of conduct that is "sufficiently continuous and

concerted in order to be deemed pervasive."  *Perry*, 115 F.3d at 149 (citation omitted).

 Lioi also asserts that the alleged breaches of her work locker and computer workstation

by Mura are evidence that she was subjected to a hostile work environment.  But Mura's alleged

actions lack any connection to Lioi's gender:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived)
> disability; and many bosses are harsh, unjust, and rude.  It is therefore important
> in hostile work environment cases to exclude from consideration [adverse actions]
> that lack a linkage or correlation to the claimed ground of discrimination.

*Alfano*, 294 F.3d at 377.  Actions that are gender-neutral on their face can be considered

in assessing the totality of circumstances, but only if there is "some circumstantial or

other basis for inferring that [such] incidents . . . were in fact discriminatory."  *Id.* at 378.

Lioi proffers no evidence that the incidents related to her work locker or computer had

anything to do with her gender.  To the contrary, when Lioi was asked why she believed

it was Mura who had been attempting to access her computer, Lioi testified that it was "[b]ecause [Mura] was constantly trying to get [work-related] information from me." Lioi Dep. 132.  Accordingly, these allegations do not support Lioi's hostile work environment claim.

Finally, to the extent Lioi alleges that her suspension and termination establish a hostile work environment, this allegation misapprehends the nature of a hostile work environment claim. As one court in this district has explained:

> Hostile work environment is not a vehicle for resurrecting time-barred claims of discrimination and retaliation; it is a wholly separate cause of action designed to address other types of work place behavior, like constant jokes and ridicule or physical intimidation.  The plaintiff cannot piggyback the discrete adverse acts about which he complains onto hostile work environment in order to make them actionable.

*Magadia v. Napolitano*, No. 06 Civ. 14386 (CM), 2009 WL 510739, at *17 (S.D.N.Y. Feb. 26, 2009); *see also Nat'l R.R.*, 536 U.S. at 115 ("Hostile environment claims are different in kind from discrete acts.  Their very nature involves repeat conduct.").  Lioi's suspension and termination, although relevant to her discrimination and retaliation claims, do not support her claim of a hostile work environment where, as here, she has failed to show how these events were in any way related to an ongoing practice of harassment.  *See Patterson*, 375 F.3d at 220.

Accordingly, for the reasons stated, even assuming that each of the allegedly discriminatory acts were not time-barred and viewing them in totality, Lioi has failed to adduce evidence sufficient to permit a reasonable jury to find that she was subjected to a hostile work environment.  Accordingly, summary judgment is granted in the City's favor on this claim, too.

## C.  Retaliation Under Title VII

Under Title VII, it is unlawful for an employer to discriminate against an employee because that employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  In adjudicating retaliation claims, courts follow the familiar burden-shifting approach of *McDonnell Douglas Corp.  See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).  To prove a *prima facie* case of retaliation, Lioi must establish: "(1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  The burden of proof at the *prima facie* stage has been characterized as "*de minimis*."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

If this initial burden is met, "a presumption of retaliation arises," and the burden shifts to the employer to "articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Id.* (quoting *Jute*, 420 F.3d at 173).  If the employer meets its burden, "'the *McDonnell Douglas* framework . . . disappear[s] and the sole remaining issue . . . [is] discrimination *vel non*.'"  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 77 (2d Cir. 2001) (brackets in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000)).  The plaintiff must then prove the ultimate issues without the "benefit of . . . intermediate burdens and presumptions."  *Id.*; *see also Holcomb*, 521 F.3d at 138.  The plaintiff may satisfy this burden by showing "pretext," *i.e.*, that the employer's proffered reason was false.  *See, e.g.*, *Reeves*, 530

31

U.S. at 143, 147.  But even in the absence of such a showing, a plaintiff may prevail by demonstrating that "an employment decision was motivated both by legitimate and illegitimate reasons."  *Holcomb*, 521 F.3d at 141–42; *see also Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination."); *Holtz*, 258 F.3d at 78.

However, the employer is entitled to judgment as a matter of law "if the record conclusively reveal[s] [a] nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact [as to pretext] and there [i]s abundant and uncontroverted independent evidence that no discrimination ha[s] occurred."  *Reeves*, 530 U.S. at 148; *see also Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 125–26 (2d Cir. 2008) (concluding that "overwhelming evidence" of legitimate reason for dismissal warranted judgment as a matter of law).

Here, Lioi's retaliation claims are based on her suspension, in November 2008, and her termination, in April 2009.  She alleges that those acts were taken in retaliation for either her January 2008 visit to the DOHMH EEO, or her December 2008 complaint against her supervisors, Evans and Haddow.  Defendants do not dispute that Lioi's suspension and termination were adverse employment actions, nor that Lioi's actions were protected activities.  Thus, to establish a *prima facie* case, Lioi must show that her employers knew of her participation in the protected activity, and that there was a causal connection between the protected activity and the adverse employment action.

First, to the extent Lioi's retaliation claim is based on her November 2008 suspension, that claim must fail.  Even assuming that defendants knew of Lioi's January 2008 visit to the DOHMH EEO, Lioi has not established a causal connection between that visit and her

32

suspension.  A causal connection can be established in two manners: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 257 (S.D.N.Y. 2007).

Here, the temporal nexus—10 months—is insufficient to establish a causal connection.  *See, e.g.*, *Chukwueze v. NYCERS*, No. 10 Civ. 8133 (JMF), 2012 WL 3758452, at *10 (S.D.N.Y. Aug. 30, 2012) (three- to six-month gap insufficient to establish causal connection); *Sank v. City Univ. of N.Y.*, No. 10 Civ. 4975 (RWS), 2011 WL 5120668, at *10–12 (S.D.N.Y. Oct. 28, 2011) (10-month gap insufficient); *see also Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) ("[T]he Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship . . . .  However, district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation.").  Neither has Lioi offered any evidence establishing that her November 2008 suspension was influenced by retaliatory animus.  And any such inference would be undermined by the fact that her male colleague, Lam, was also suspended as a result of the emails that Lioi sent him.

Second, Lioi asserts that she was terminated in April 2009 in retaliation for the complaints of discrimination that she made against Evans and Haddow in December 2008.  There is clear evidence that Evans and Haddow knew of the protected activity, *see* Minnah-Donkoh Decl. Exs. EE–FF, and this is sufficient to establish the second element of Lioi's *prima facie* case.  *See Risco v. McHugh*, 868 F. Supp. 2d 75, 112 (S.D.N.Y. 2012) (general corporate knowledge sufficient to satisfy second element of *prima facie* case of retaliation, regardless of

whether individual decision-maker knew of complaint); *see also Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) ("Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.").

However, Lioi still cannot establish a causal connection between her termination and her December 2008 complaints (nor, for that matter, her January 2008 visit to the DOHMH EEO). Although the temporal nexus between her termination and the December 2008 complaints—five months—is closer, it still falls outside the range of proximity from which courts in this District infer a causal connection. *See Murray*, 528 F. Supp. 2d at 275. More significantly, however, when Lioi filed her complaints in December 2008, the disciplinary process regarding her breach of the confidentiality policy was already under way. Indeed, at the time of her complaints, Lioi had already been suspended as a result of her actions. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *see also Mayling Tu v. OppenheimerFunds, Inc.*, No. 10 Civ. 4971 (PKC), 2012 WL 516837, at *10 (S.D.N.Y. Feb. 16, 2012) (collecting cases where adverse job actions prior to protected activity negate inference of retaliation).

Although Lioi concedes as much, she argues that retaliatory animus is evidenced by the fact that she was given a more severe punishment than Lam, and that the disparity between her termination and Lam's mere suspension gives rise to an issue of material fact sufficient to defeat summary judgment. Pl. Br. 24. That argument is without merit. First, Lioi's argument fails to acknowledge that having been the sender of an email that contained confidential information

placed her in a substantially different position than Lam, as the mere recipient of the same.

Second, the complaints were filed against Evans and Haddow, but neither was involved with the

decision to terminate Lioi.  *See* Evans Dep. 34; Haddow Dep. 81.  Just as discriminatory

"remarks made by someone other than the person who made the decision adversely affecting the

plaintiff may have little tendency to show that the decision-maker was motivated by []

discriminatory sentiment," *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir.

2007), the fact that certain non-decision-makers may have a motive to retaliate has little

tendency to show that the actual decision-maker was motivated by retaliatory animus.  And, as

discussed *supra*, there is no evidence that Evans and Haddow influenced the decision-maker in

any way.

 In any event, even assuming that Lioi could establish a *prima facie* case, the burden

would then shift to defendants to show a legitimate, non-retaliatory reason for the adverse action.

As the Court has already concluded, defendants have done so, and Lioi cannot demonstrate

pretext.  *See supra* Part IV(A)(2).  Accordingly, summary judgment must be granted in the City's

favor on this claim, also.

 **D.  State and City Human Rights Claims**

 Lioi also brings claims for gender discrimination and retaliation under state and city

human rights laws.  "[C]laims brought under New York State's Human Rights Law are

analytically identical to claims brought under Title VII." *Rojas v. Roman Catholic Diocese of

Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (citation omitted).  By contrast, the applicable

standard under the NYCHRL is materially different from the Title VII standard.  *See Fincher v.

Depository Trust and Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010) ("New York State courts

and district courts in this Circuit have concluded . . . that the retaliation inquiry under the [NY]CHRL is 'broader' than its federal counterpart.").

Because Lioi's claims under Title VII have been dismissed, the Court must decide whether to retain jurisdiction over the remaining claims. Federal district courts have supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). As the Supreme Court stated in discussing Section 1367's predecessor judicial doctrine of pendent jurisdiction, this is traditionally "a doctrine of discretion, not of plaintiff's right." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Section 1367(c) "confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997). Of particular relevance here, a district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

Once a district court's discretion is triggered under Section 1367(c)(3), the Court balances the traditional "values of judicial economy, convenience, fairness, and comity" in deciding whether to exercise jurisdiction. *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Both the Second Circuit and the Supreme Court have held that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers*, 383 U.S. at 726). Although the exercise of supplemental jurisdiction is discretionary, in the ordinary case the balance of factors "will point toward declining jurisdiction over the remaining state-law claims." *Id.* at 61 (citing *Cohill*, 484 U.S. at 350 n.7).

36

Although this Court has in appropriate cases exercised its discretion to retain supplemental jurisdiction over both NYSHRL and NYCHRL claims, *see Moccio v. Cornell Univ.*, No. 09 Civ. 3601 (PAE), 2012 WL 3648450, at *46 (S.D.N.Y. Aug. 27, 2012), or only NYCHRL claims, *see Mendez-Nouel v. Gucci Am., Inc.*, No. 10 Civ. 3388 (PAE), 2012 WL 5451189, at *16–17 (S.D.N.Y. Nov. 8, 2012), in this case the Court declines to exercise supplemental jurisdiction over either set of claims, for two reasons.  First, despite the identical standards for Title VII and NYSHRL claims, state law differs in allowing supervisory liability, *see Rojas*, 660 F.3d at 107 n.10, which may be relevant here.  *See supra* p. 17 n.4.  More importantly, however, *both* parties urge the Court to decline to exercise supplemental jurisdiction.  *See* Pl. Br. 25; Def. Br. 19 n.3.  The Court will not stand in the way of the parties' shared wishes.

## CONCLUSION

For the foregoing reasons, defendants' motion is granted as to Lioi's claims under Title VII. The Clerk of Court is directed to enter judgment in defendants' favor as to those claims. Because the Court declines to exercise supplemental jurisdiction over Lioi's NYSHRL and NYCHRL claims, they are dismissed without prejudice. The Clerk of Court is directed to terminate the motion at docket number 20, and to close this case.

SO ORDERED.

_Paul A. Engelmayer_

Paul A. Engelmayer
United States District Judge

Dated: December 19, 2012
      New York, New York